# STANDARD MOTOR COMPANY

*vs.*

# ERNEST SHOCKEY.

*Practice Act—Admission by Defendant—Contracts—Automobile Distributor—Failure to Fill Order.*

If one suing under the Practice Act of 1886 fails, before the trial of the case, to take judgment for the amount admitted in defendant's affidavit, but elects to proceed to trial for the recovery of the whole amount claimed by him, after joining issue on the defendant's plea as filed, defendant is not bound by the admission in his affidavit, and the burden is on plaintiff to establish his claim as if no admission had been made.    p. 132

Since a prayer which makes no reference to the pleadings is held to relate exclusively to the evidence, and its correctness is to be determined entirely by a consideration of the evidence, the question is, in passing upon such a prayer asking the direction of a verdict for defendant, not whether the evidence furnishes any proof of the cause of action sued on, but whether it supplies proof of any cause of action whatever.    p. 133

Where the only services rendered plaintiff by defendant were rendered under the terms of a contract in evidence, there can be no recovery under any implied contract for compensation according to the value of his services.    p. 133

Where the only loss claimed by plaintiff to have been suffered by him, as a result of defendant's failure to deliver a certain article, was the loss of a discount from defendant's list price, allowed him under a contract between them, he had no cause of action in case the contract was no longer in existence at the time he gave the order for the article.    p. 134

Where a company distributing automobiles of a certain make notified a dealer that the contract between them was terminated, and the dealer accepted this as a valid notice of the termination of the contract, within a provision authorizing either party to

terminate the contract on violation thereof by the other, *held* that the company was not responsible for failure thereafter to deliver an automobile to such dealer, the contract by its terms cancelling all orders unfilled at the time of the receipt of notice of termination.                    p. 135

A provision in the contract that "all accepted orders shall be filled by the distributor as rapidly as practicable, consistent with the schedule given by the distributor to the dealer, and consistent with the requirements of the distributor's other customers, subject, however, to delays caused by strikes, fires, transportation difficulties, or any other cause beyond the distributor's control," *held* to exempt the distributor from liability for delay in delivery if it distributed the automobiles in accordance with a definite scheme of allotment adopted by it for the benefit of its business and with no particular reference to this dealer.

p. 135

A provision in a contract that one party shall not be liable for any loss or damage from its failure to deliver goods ordered by the other is binding and effective.                    p. 136

*Decided June 28th, 1921.*

Appeal from the Superior Court of Baltimore City (SOPER, C. J.).

Action by Ernest Shockey against the Standard Motor Company. From a judgment for plaintiff defendant appeals. Reversed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*J. Purdon Wright,* with whom was *Paul R. Kach* on the brief, for the appellant.

*Alan H. Fisher,* with whom was *Omer T. Kayler* and *Fisher & Fisher* on the brief, for the appellee.

Offutt, J., delivered the opinion of the Court.

The Standard Motor Company of Baltimore, Maryland, an automobile distributor engaged in the sale of Cadillac automobile in Maryland, on September 1st, 1917, entered into a contract with Ernest Shockey, an automobile dealer in Hagerstown, to sell to him Cadillac automobiles.

Under this agreement the appellant, called the distributor, agreed to sell to the appellee, called the dealer, Cadillac automobiles, automobile bodies and chassis at "net prices to be agreed upon from time to time * * * at a discount of 15% from list prices," to replace or repair defective parts under certain conditions, and at its option to furnish the dealer pamphlets, circulars, and other written matter descriptive of the automobiles. The dealer agreed to work and develop to the satisfaction of the distributor and manufacturer the territory of Washington County, to advertise there the automobiles, to report monthly to the manufacturer and the distributor all deliveries of Cadillac automobiles, with the details incident thereto, to keep in stock at least one Cadillac automobile, and a stock of automobile parts, to install without charge "such parts as the manufacturer supplied gratis" for use on its automobile, to render free inspection service for a stated period on all new automobiles sold by the dealer, and "to pay in par funds for all goods ordered, on or before delivery to the carrier." It further provided that the dealer should not be entitled to any compensation from the distributor for work done or material used except upon its written order, that all accepted orders should be filled by the distributor as "rapidly as practicable, consistent with the schedule given by the distributor to the dealer, and consistent with the requirements of the distributor's other customers." The parties also agreed: "That the dealer is not authorized or empowered to act as agent for the distributor or the manufacturer; nor to transact business, incur obligations or bill goods in the name or for the account of the distributor or manufacturer, nor on behalf

of the distributor or of the manufacturer to make any promise, warranty or representation with respect to goods or any other matter; and that the distributor or manufacturer shall not be bound by the acts or conduct of the dealer," and that no alterations of the terms of the contract should be valid unless in writing and signed by the distributor and "that this contract supersedes all previous contracts between the parties hereto and expires by limitation July 1st, 1918, or may be terminated at the pleasure of either party, with or without cause or reason, upon thirty days' written notice given through the usual course of mail, or otherwise; provided, however, that for any violation of the provisions hereof by either party, the other party may terminate the same without notice. The termination of this contract shall cancel all orders for goods which may not have been delivered prior to the date of notice of such termination; but does not release the dealer from the payment of any sum which he may then owe the distributor. After the termination of this agreement, the sale of goods, or the referring of inquiries by the distributor to the dealer, shall not be considered as a renewal hereof; nevertheless, all orders thereafter accepted by the distributor shall be according to the provisions hereof." It also contained other provisions which are not material to the consideration of any question before us and need not be noticed.

On August 6th, 1918, the distributor wrote Shockey that the discount allowed to him on purchases of automobiles would be increased to eighteen per cent. and the contract extended to July 1st, 1919.

On October 6th, 1919, Shockey sold a Cadillac automobile to James Koleopolis for $4,522.15, and took from the purchaser a deposit of $100, and at once mailed the contract with his own check for $100 to the appellant, and ordered from it an automobile to be delivered to Koleopolis in accordance with his contract with the latter. This order was not filled but, on December 26th, 1919, he received a letter from the Standard Motor Company notifying him that, on January 1st, 1920, it

would "sever all agency connection" with him.  In this letter
the company among other things said:  "We have taken into
consideration many things before arriving at this decision,
and in fact have let the matter run along since the expiration
of your contract until the present time, as we wanted to be
sure of the best course to pursue, and did not wish to do you
an injustice in any way."   Shockey never received the auto-
mobile he ordered from the appellant, and consequently did
not deliver to Koleopolis the automobile he agreed to sell him,
but later Koleopolis purchased and received an automobile
from the Flay Motor & Tire Company, which succeeded
Shockey as a dealer in Cadillac automobiles in Washington
County, and on March 5th, 1920, the appellant wrote Shockey
as follows:  "We recently delivered to Mr. James Koleopolis,
the Victoria for which you gave us $100.00 deposit several
months ago.   We have credited your account with 5% of
list price of Victoria, feeling that you should be compensated
for your effort in making sale.   This credit is made notwith-
standing the fact that your contract expired sometime before
this transaction was completed.   The amount of credit was
$217.00.   We have also credited your account with deposit of
$250.00, which has been held by us for some time.   After
applying these two credits, there is a balance in your favor of
$63.33, check for which is attached."

The arrangement proposed in this letter not being satisfac-
tory to him, on March 30th, 1920, he sued the appellant under
the Practice Act of 1886 in the Superior Court of Baltimore
City.   The declaration contained the six common counts and
two special counts, and to it was attached the contract referred
to and an account in the following form:

"March 29th, 1920.

"Standard Motor Company to Ernest Shockey:
   "Amount on deposit with Standard Motor
      Company. . . . . . . . . . . . . . . . . . . . . . . .    $250.00
   "Amount due for sale of car to James Ko-
      liopules, 18 per cent. of $4,140.00. . . . . . .    745.20

"Amount due for sale to Dr. J. Hubert
Wade, 18 per cent. of $4,450.00........  801.00

                                    $1,796.20

"Less amount due to Standard Motor Com-
pany............................  403.67

                                    $1,392.53,"

and an affidavit as required by the Act of 1886. The defendant filed the general issue pleas and an affidavit in which it admitted $66.33 of the claim to be due and owing, but disputed the balance. The trial of the issues thus presented resulted in a judgment for the plaintiff, and from that judgment this appeal is taken. The record contains ten exceptions, of which nine relate to questions of evidence and one to the court's ruling on the prayers. The plaintiff offered no prayers. The defendant offered eight, of which one was granted and the others refused. These rulings are the subject of the tenth exception, which we will now consider.

The defendant in its first prayer asked the court to direct a verdict in its favor, on the ground that the plaintiff had offered no evidence legally sufficient to entitle him to recover. It is contended that this prayer could not have been granted because the defendant in its affidavit admitted $63.33 to be due the plaintiff. But that contention cannot prevail, for while under the terms of the act the plaintiff could, before the trial of the case, have taken a judgment for the amount admitted to be due, and have proceeded to trial for the recovery of the amount which was disputed, yet since he failed to do that, but elected to proceed to trial for the recovery of the whole amount claimed by him to be due, after joining issue on the defendant's pleas as filed, the defendant at such trial was not bound by the admission in its affidavit, and the burden was upon the plaintiff to establish the claim upon which the suit was brought as in other cases, as though no such admission had been made. *Laubheimer* v. *Naill*, 88 Md. 174;

*Sisters of Notre Dame* v. *Kusnitt,* 125 Md. 341; *Nat. Bldg. Co.* v. *Gosnell,* 116 Md. 646; *Smith* v. *Woman's Medical College,* 110 Md. 444; *Legum* v. *Blank,* 105 Md. 134.

Inasmuch as the prayer makes no reference to the pleadings, it will be "held to relate exclusively to the evidence" and its "correctness will be determined entirely by a consideration of the evidence" (*Whitby* v. *Balto. C. & A. Ry. Co.,* 96 Md. 700; 2 *Poe, Pl. & Prac.,* sec. 302), and the question therefore is whether there is in the case evidence legally sufficient to show any indebtedness at all due to the plaintiff by the defendant. It therefore is necessary to examine the evidence with a view to discovering, not whether it furnishes any proof of the cause of action sued on, but whether it supplies proof of any cause of action whatever. Such an examination demonstrates that, if we disregard the admission in the affidavit of defense, as we must do under the circumstances of this case, there is no evidence that at the institution of this suit the appellant was indebted to the appellee for anything at all, unless as a result of the transaction which is referred to as the sale of Koleopolis' automobile, for while it does appear that the appellee at the time this suit was brought had on deposit with the appellant $350, yet he admitted that as against that he owed the appellant over $400.

Nor does it appear that the appellee rendered to the appellant any services for which he was entitled to recover under any implied contract for compensation according to the value of his services, for it appears that the only services which he rendered were rendered under the terms of the express contract offered in evidence. There was no relation of master and servant between the parties to this suit, nor was there a relation of principal and agent, because the contract in terms negatives the hypothesis of such a relation.

The only remaining ground upon which a recovery could be sought is that the appellant contracted with the appellee to sell him an automobile and that it did not perform that contract. The contract offered in evidence is in effect an under-

taking on the part of the appellant to sell automobiles to the
appellee at a certain discount. In consideration of that dis-
count the appellee undertook to render certain specific serv-
ices designed to promote the sale of the make of automobiles
handled by the appellant. That contract by its terms ended
July 1, 1919, but by its terms all orders accepted thereafter
were to be "according to its provisions." But while it auto-
matically terminated on July 1st, 1919, it was treated by both
parties to it as continuing until its cancellation in December
of that year, for the appellee in this case claims the discount
allowed by it, to which he could only be entitled upon the
hypothesis that, when he ordered the automobile in October,
1919, the contract allowing the discount was in force, and
the appellee, in its letter of December 26th, 1919, expressly
recognized its continuance, and we will therefore assume for
the moment that it was renewed on July 1st, 1919, and con-
tinued in force until its cancellation in December, 1919.

If the contract was not in force at the time he gave the
order for the automobile, clearly he was not injured by the
failure of the appellant to deliver it, because the only loss he
claims to have suffered is the loss of eighteen per cent. dis-
count from the list price allowed him under the contract. He
had no claim to any discount from the list price of the auto-
mobile aside from the contract, and if it was not in existence
he had none at all, and as there is no evidence that he suffered
any loss as a result of the appellant's failure to deliver to him
the automobile, except the loss of the discount, it follows that,
if the contract was not in force when he gave the order for the
automobile, no cause of action accrued to him from the appel-
lant's failure to deliver it.

But assuming that the contract was in force when the order
was given, what then is the appellee's position under the evi-
dence? The contract provided it could be terminated at any
time by either party with or without cause upon thirty days'
notice, and by either party without notice for any violation
of the terms of the contract, and that its termination should

"cancel all orders for goods" not delivered prior to the notice of cancellation. The appellant notified the appellee on December 26th that the contract would be terminated on January 1st, 1920. The appellee testified that the "Standard Motor Company terminated the agency by that letter," and he therefore regarded and accepted it as a valid notice of the termination of the contract, and it became unnecessary to inquire whether there was any breach of the contract by the appellee justifying a termination of the contract upon less than thirty days' notice. The appellant could not be held responsible for its failure to deliver the machine after it terminated the contract, for by its terms such termination automatically cancelled all orders unfilled at the time the notice of termination was received. But the appellee contends that the appellant is responsible because it could have delivered the machine before the termination of the contract, but that it negligently or wilfully failed to do so, but there is no evidence which can be said to be legally sufficient to support that contention. It is true that it appears that the appellant delivered automobiles of the type ordered by the appellee upon orders accepted after his order was given, but it appears that they were distributed in accordance with a definite scheme of allotment adopted by the appellant for the benefit of its business and with no particular reference to the appellee. In doing that the appellant was acting within the discretion which it reserved to itself under that clause of the contract which provides: "That all accepted orders shall be filled by the distributor as rapidly as practicable, consistent with the schedule given by the distributor to the dealer, and consistent with the requirements of the distributor's other customers, subject, however, to delays caused by strikes, fires, transportation difficulties, or any other cause beyond the distributor's control; that the *distributor* or the manufacturer *shall not be liable for any loss or damage from its failure to deliver goods ordered.*"

But even if there were proof that in failing to deliver the machine the appellant acted wilfully, it could not help the situation, because in the clause last cited the appellee expressly agreed that the appellant should "not be liable for any loss or damage from its failure to deliver goods ordered." In the absence of anything impeaching the validity of the contract, we know of no reason why the parties who have executed it should not be bound by its terms. And since the appellee has in it agreed that the appellant shall not be liable for any loss or damage for "its failure to deliver goods ordered" he cannot now be permitted to repudiate his agreement and do the very thing which, he agreed, could not be done.

From what has been said it follows that the first prayer of the appellant should have been granted and the case withdrawn from the consideration of the jury.

As this conclusion finally disposes of the case no further discussion of the exceptions is necessary.

For the error in refusing the first prayer of the appellant it will be necessary to reverse the judgment appealed from.

> *Judgment reversed without a procedendo, with costs to the appellant.*